**AMOCO OIL COMPANY et al.,
Petitioners,**

v.

**ENVIRONMENTAL PROTECTION
AGENCY, Respondent.**

**ASHLAND OIL, INC. and Skelly Oil
Company, Petitioners,**

v.

**ENVIRONMENTAL PROTECTION
AGENCY, Respondent.**

**CLARK OIL AND REFINING COR-
PORATION, Petitioner,**

v.

**ENVIRONMENTAL PROTECTION
AGENCY, Respondent.**

**Nos. 73-1117, 73-1118 and 73-1150.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 13, 1974.

Decided May 1, 1974.

William Simon, Washington, D. C.,
with whom James F. Davis and Wil-

liam R. O'Brien, Washington, D. C., were on the brief, for petitioners in No. 73–1117.

H. Edward Dunkelberger, Jr., Washington, D. C., with whom Theodore L. Garrett, Washington, D. C., was on the brief, for petitioners in Nos. 73–1118 and 73–1150.

Edward J. Shawaker, Atty., Dept. of Justice, with whom Wallace H. Johnson, Asst. Atty. Gen., and Edmond B. Clark and Martin Green, Attys., Dept. of Justice, were on the brief, for respondent. Kent Frizzell, Asst. Atty. Gen. at the time the record was filed, also entered an appearance for respondent.

Before HASTIE * Senior Circuit Judge, and WRIGHT and ROBB, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

In these consolidated cases, many of the nation's oil companies seek review of the Environmental Protection Agency's "Regulation of Fuels and Fuel Additives," 40 C.F.R. Part 80 (1973) (hereinafter Fuel Regulations), promulgated under Sections 211(c) and (d) of the Clean Air Act.[1] The Regulations prohibit use of leaded gasoline in automobiles fitted with "catalytic converter" devices for controlling exhaust emissions and require widespread retail marketing of at least one grade of unleaded gasoline.

Oil refiners have for many years routinely added lead to gasoline to improve its "anti-knock" and other performance characteristics. Because air-borne lead may present a serious threat to public health, EPA has promulgated regulations, not here at issue, to limit the lead content of all gasoline.[2] The Fuel Regulations under review address a narrower problem: Lead emissions "poison"—i. e. render inactive—the catalytic converter devices on which the automobile industry is relying to reduce exhaust emissions of hydrocarbons, carbon monoxide, and oxides of nitrogen to the levels mandated for new cars by Section 202 of the Clean Air Act.[3] Catalytic converters will be fitted on many 1975 model new cars and on most or all 1976 model new cars. The Regulations take effect on July 1, 1974, at the advent of the 1975 model year. To secure efficient operation and widespread use of converters, the Regulations require that converter-equipped cars use only unleaded gasoline and that retail stations having a sizeable clientele offer at least one grade of such fuel.

Petitioners challenge the Regulations on a host of grounds, examined in Part II of this opinion. The root of petitioners' interest is financial. To refine gasoline without adding lead is neither difficult nor very expensive, but years of producing and delivering only leaded fuel have left deposits of the element in the containers, pipes, and vehicles by which the industry moves gasoline from refinery to automobile gas tank. Portions of this distribution network must be cleaned or replaced if the new converter-equipped cars are to be sold, used, and serviced in normal and convenient fashion. That such a cleanup would be necessary by 1975 has been known for a number of years,[4] but the oil industry

---

* Of the Third Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. 42 U.S.C. § 1857f–6c(c) & (d) (1970). These provisions were enacted by § 9(a) of the Clean Air Act Amendments of 1970, Pub.L. 91–604, Dec. 31, 1970, 84 Stat. 1698–1700. For Regulations, see Appendix to this opinion.

2. 38 Fed.Reg. 33741 (Dec. 6, 1973). These health-oriented regulations will be contained in 40 C.F.R. §§ 80.2(m), 80.20, 80.25, & 80.26.

3. 42 U.S.C. § 1857f–1 (1970). The "poisoning" effect of leaded gasoline on catalytic converters is discussed at length in a cost-benefit analysis submitted to the Agency by the Aerospace Corporation, Final Report: An Assessment of the Effects of Lead Additives in Gasoline on Emission Control Systems Which Might be Used to Meet the 1975–76 Motor Vehicle Emission Standards § 5.1 (Nov. 15, 1971) (hereinafter cited as Aerospace Report).

4. The Regulations were proposed in substantially their present form on Feb. 23, 1972,

contends that the present Regulations impose demands which are unnecessarily and unlawfully far-reaching and abrupt.

We have located problems in the "liability" provisions of the Regulations and have accordingly required the Agency to recognize certain affirmative defenses to these provisions. *See* Part II–D below. In all other respects, however, we find the Regulations to be valid.

## I. STATUTORY SETTING, THE PROCEEDINGS, AND THE REGULATIONS

These Regulations are an integral element in the complex program to reduce air pollution which Congress adopted by way of the Clean Air Act Amendments of 1970. At the core of that program, in Section 202 of the Act, is a graduated schedule for reducing exhaust emissions from new cars. Congress mandated EPA to set standards for 1975 and post-1975 model cars "which require a reduction of at least 90 per centum from emissions of carbon monoxide and hydrocarbons allowable * * * in model year 1970"; for 1976 and post-1976 model cars, the standards are to "require a reduction of at least 90 per centum from the average of emissions of oxides of nitrogen actually measured * * * during model year 1971." Section 202(b)(1)(A) and (B). The Administrator was empowered to suspend these deadlines under extraordinary circumstances, but "for one year only," Section 202(b)(5)(A) and (B), and only if he simultaneously established "interim standards" which

> reflect the greatest degree of emission control which is achievable by application of technology which the Administrator determines is available, giving appropriate consideration to the cost of applying such technology within the period of time available to manufacturers.

Section 202(b)(5)(C).

Foreseeing that achievement of this schedule might require regulation of fuels, and foreseeing in particular the possible need to regulate gasoline's lead content so as to protect catalytic converters,[5] Congress authorized the Agency to promulgate regulations which

> control or prohibit the manufacture, introduction into commerce, offering for sale, or sale of any fuel or fuel additive for use in a motor vehicle or motor vehicle engine * * * (B) if emission products of such fuel or fuel additive will impair to a significant degree the performance of any emission control device or system which is in general use, or which the Administrator finds has been developed to a point where in a reasonable time it would be in general use were such regulation to be promulgated.[6]

Section 211(c)(1). The Administrator must subject his proposed regulations to a "public hearing" before promulgating them in final form. Section

---

37 Fed.Reg. 3882. Advance notice of the proposed rule-making was published on Jan. 30, 1971, 36 Fed.Reg. 1486. Furthermore, when the Clean Air Act Amendments were being debated in 1970, it was widely recognized that catalytic converters requiring use of unleaded gasoline would probably be necessary to meet the emission standards under consideration for the 1975 model year. *See* e. g., S.Rep.No. 91–1196, 91st Cong., 2d Sess. (Committee on Public Works), at 34 (Sept. 17, 1970). On Aug. 19, 1971, the Mobil Oil Corporation represented to EPA:

> Seven of the major oil marketers are now making extensive additions to their distribution and marketing facilities in order to market at their larger service stations the three grades of gasoline which will be needed in the future. Three other majors already have comparable three-grade capability, and two more can accomplish similar results with their blending pumps. Eight majors have already introduced an unleaded grade and others have committed themselves to supplying unleaded gasoline when the need for it is established.

Supplement to the record at p. 3548. *See* note 10 *infra*.

5. *See* S.Rep.No. 91–1196, *supra* note 4, at 34.

6. The same section also authorized prohibition or control of a fuel or fuel additive "(A) if any emission products of such fuel or fuel additive will endanger the public health or welfare."

211(c)(2)(B). No fuel regulation may be undertaken "except after" the Administrator has considered, and published "findings" on, the comparative merits of emission control devices, in or near "general use," which do and which do not require use of regulated fuels. Section 211(c)(2)(B). The Administrator must also find that prohibition of a particular fuel or additive will not cause use of another fuel or additive which endangers "the public health or welfare to the same or greater degree than the use of the fuel or fuel additive proposed to be prohibited." Section 211(c)(2)(C). The Act mandates a "civil penalty of $10,000" per day against "[a]ny person who violates * * * the regulations prescribed," though the Administrator may "remit or mitigate" the penalty at his discretion. Section 211(d).

EPA published its proposed regulations of gasoline's lead content on February 23, 1972,[7] the proposals dealing with both the catalytic converter problem and the direct health impact of airborne lead. The Agency solicited comments from all interested parties and held public hearings on the proposals in three cities. Petitioners participated fully in these proceedings and do not challenge their regularity.

On January 10, 1973 the final regulations now under review were promulgated.[8] In a simultaneous decision not now before us, regulations dealing with the health impact of air-borne lead were reproposed for further public discussion. The Administrator accompanied the final Fuel Regulations with a

statement explaining and justifying them (hereinafter the Statement), which we append to this opinion. So far as is pertinent to this case, the Regulations presently provide as follows:[9]

"Unleaded gasoline" is defined as "gasoline containing not more than 0.05 gram of lead per gallon and not more than 0.005 gram of phosphorous per gallon." 40 C.F.R. § 80.2(g). Cars fitted with catalytic converters must carry markings or design features showing that only unleaded gasoline may be used. 40 C.F.R. § 80.24. On pain of a civil fine of $10,000 per day, 40 C.F.R. § 80.5, retailers, and their employees and agents, are forbidden to introduce leaded gasoline into cars marked or designed for exclusive use of unleaded fuel. 40 C.F.R. § 80.22(a). If the offending retailer displays a refiner's corporate trademark, the refiner is made vicariously liable for the offense, 40 C.F.R. § 80.23(a)(1); if the offending retailer did not display a refiner's trademark, vicarious liability runs to "any distributor who sold the retailer gasoline contained in the retail outlet storage tank which supplied that pump at the time of the violation * * *." 40 C.F.R. § 80.23(a)(2). In both cases, however, there is no vicarious liability, and the retailer alone is liable, where the retailer introduced the leaded gasoline "from a pump from which leaded gasoline is sold." 40 C.F.R. § 80.23(c). Finally, the Regulations affirmatively require marketing of at least one grade of unleaded gasoline by "every person who owns, leases, operates, controls, or supervises a

---

7. *See* note 4 *supra.*

8. 38 Fed.Reg. 1254.

9. Of the several alterations in the Regulations since their date of issuance, two are pertinent to this litigation. On Oct. 12, 1973, the Agency proposed deleting 40 C.F.R. § 80.22(c), 38 Fed.Reg. 28301–28302. This provision required marketing of at least one grade of unleaded gasoline at 60% of the retail outlets of "every person who owns, leases, operates, controls, or supervises six or more retail outlets." As noted in text, an unchanged provision, 40 C.F.R. § 80.22(b), establishes an affirmative market-

ing requirement on somewhat different criteria. We have assumed here that 40 C.F.R. § 80.22(c) is no longer part of the Regulations. On Dec. 11, 1973, the Agency proposed adding 40 C.F.R. § 80.3 to the Regulations, 38 Fed.Reg. 34126. This provision details the procedures the Agency will use in determining the lead content of gasoline samples for enforcement purposes. This provision is not under review in the present litigation. For purposes of review, we proceed under the assumption that test procedures have not yet been formulated by the Agency. *See* Part II–B–(3) of this opinion *infra.*

retail outlet at which 200,000 or more gallons of gasoline was sold during any calendar year beginning with the year 1971." 40 C.F.R. § 80.22(b).

During and after final promulgation of the Regulations, certain events transpired which bear upon the issues before us.[10] On February 10, 1973, this court remanded for reconsideration EPA's decision, under Section 202(b)(5) of the Clean Air Act, not to suspend for one year the 1975 emission standards established by the Agency pursuant to Section 202(b)(1)(A) of the Act. International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 478 F.2d 615 (1973). On April 11, 1973, after new public hearings, the Administrator decided to suspend the 1975 standards and to replace them with a set of "interim standards."[11] Under this "interim" program, special standards apply to all 1975 model cars sold in California; these cars must produce no more than .9 gram per mile of hydrocarbons, 9.0 grams per mile of carbon monoxide, and 2.0 grams per mile of nitrogen oxides.[12]

The Administrator stated:

> These standards in my judgment will require use of catalytic converters on all 1975 passenger cars shipped to California. California sales of such vehicles constitute approximately ten percent of total United States new car sales.[13]

The standards for 1975 model cars sold outside California are less stringent: 1.-5 grams per mile of hydrocarbons, 15 grams per mile of carbon monoxide, and 3.1 grams per mile of nitrogen oxides.[14] From these standards the Administrator drew guarded conclusions about the probable use of catalytic converters outside California:

> * * * These standards can, in my judgment, be achieved by manufacturers generally on most models without use of catalytic devices. In my judgment these standards will not require use of catalysts on more vehicles sold outside California than manufacturers are capable of producing without the possibility of severe production difficulties.

---

10. A reviewing court must tread cautiously in considering events occurring subsequent to promulgation of a rule. Obviously, such events did not inform the agency decision-making which is the subject of review. Furthermore, information on such events reaches a reviewing court untested by any procedures, such as an administrative hearing, designed to assure its accuracy and completeness. We have kept these problems in mind in weighing EPA's motion of Sept. 6, 1973 to supplement the record in these cases. Decision on the motion has been deferred to this point. The proffered supplement contains various documents, labeled G through L. Items G, J, K, and L are submissions to the Agency by interested parties, or intra-Agency memoranda, made prior to the issuance date of the Regulations. These items informed the Agency's decision-making and are properly part of the administrative record. Item I is a technical study submitted to EPA after promulgation of the Regulations. As the Regulations could not have been formulated on the basis of this study, we will not allow it into the record on review. Item H consists of certain testimony given by representatives of two American automakers to a congressional committee. Because the testimony was given after issuance of the Regulations, it was not a factor

in the Agency's original decision-making; however, the testimony bears directly upon the plausibility of certain predictions made by the Administrator in promulgating the Regulations. Subsequent to the testimony, the Administrator formally reaffirmed these predictions, 38 Fed.Reg. 28301 (Oct. 12, 1973). Rule-making is necessarily forward-looking, and by the time judicial review is secured events may have progressed sufficiently to indicate the truth or falsity of agency predictions. We do not think a court need blind itself to such events, at least when the events are evidenced by public testimony given to a governmental body. A contrary rule would convert the reviewing process into an artificial game. Accordingly, we shall accept Item H into the record.

11. The April 11 decision of the Administrator (hereinafter the April 11 Decision) is published at 38 Fed.Reg. 10317–10330 (April 26, 1973). Formal promulgation of the interim standards was made at 38 Fed.Reg. 17441 (July 2, 1973).

12. The April 11 Decision, 38 Fed.Reg. at 10319.

13. *Id.*

14. *Id.*

\* \* \* \* \* \*

\* \* \* I believe that the requirement to install catalytic converters on all 1975 automobiles shipped to California and on a portion of 1975 cars sold outside California \* \* \* will maintain the accelerating momentum of technological progress which has so clearly characterized catalyst development for automative applications during the past two years. \* \* \*

\* \* \* \* \* \*

\* \* \* To the extent that additional transportation controls are needed outside California, vehicles designed for California can be purchased in 1975 by fleet operators, such as taxicab companies. \* \* \*

\* \* \* \* \* \*

In setting interim standards for the rest of the country, I have not felt constrained to avoid any reliance upon catalysts to enable auto manufacturers to meet the certification requirements. I anticipate that for certain model lines catalysts may be required. The likelihood that a significant number of cars will be distributed across the country equipped with catalysts will supplement the experience derived in California in a beneficial way.[15]

The Administrator recognized that the new 1975 standards, and the catalyst use they might or might not bring forth, had an important bearing on the Fuel Regulations earlier promulgated. He concluded, however, that the Regulations remained necessary:

Since the interim standards established by this decision will require catalysts on all vehicles sold in California, many of which will undoubtedly travel to other parts of the country,

and on a significant number of vehicles sold in the other 49 States, lead-free gasoline must be generally available nationwide by the beginning of the 1975 model year. This will be accomplished by regulations that have already been promulgated.[16]

Subsequent to this statement, it has become clear that at least General Motors and Ford intend to fit converters on a substantial number of their 1975 cars sold outside California, as well as on all cars sold within California. On May 23, 1973 the president of Ford Motor Company testified before a Senate subcommittee:

We can and will meet the 1975 interim standards, in spite of the serious doubts we expressed only a short time ago. It will be done with some difficulty, however. \* \* \*

\* \* \* We will also have to apply to certain engines nationwide the catalytic system that we had hoped could be used only in California during the 1975-model year.

This may involve 15 percent of production for the other 49 states. \* \* \*

\* \* \* \* \* \*

\* \* \* I fear, I had hoped we could confine them to California. The way it turned out, another 15 percent of the nation will get them and there will be Ford cars spread out in Oregon and Maine and Florida. \* \* \* [17]

On May 30 the president of General Motors testified before the same Senate subcommittee:

\* \* \* [T]he addition of the converters to our advanced control systems provides stronger assurance of

15. *Id.* at 10319, 10320 & 10324.

16. *Id.* at 10327. We regard these comments as a formal supplement to the Statement which accompanied issuance of the Fuel Regulations. Courts not infrequently remand orders or rules to an agency for a fuller statement of reasons and justification. *See, e. g.,* FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 249–250, 92 S.Ct. 898, 31 L. Ed.2d 170 (1972) ; SEC v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995

(1947) ; Essex Chemical Corp. v. Ruckelshaus, 158 U.S.App.D.C. 360, 372 n. 40, 486 F.2d 427, 439 n. 40 (1973). *A fortiori* an agency may provide such supplementation *sua sponte.*

17. Testimony of Lee Iacocca, President, Ford Motor Co., before the Subcommittee on Air and Water Pollution, Senate Committee on Public Works, May 23, 1973, stenographic transcript pp. 368 & 445, supplement to the record at pp. 3554–3555.

compliance and, based upon the limited testing to date, no loss of fuel economy (perhaps even an improvement), and better performance. Only in cars where we see that catalytic converters will not be needed to provide this assurance will we market our 1975 cars without them.

\* \* \* \* \* \*

It is \* \* \* probable, based on current planning, that the majority of our 1975 cars will have new carburetion and ignition systems to maintain or improve fuel economy and engine performance; some will need air pumps, and in most cases—perhaps all —catalytic converters may also be necessary or desirable.[18]

Subsequent to this testimony, the Administrator formally reaffirmed his conclusion of April 11 that converters would be in widespread use in 1975, noting that

statements by representatives of the motor vehicle manufacturers have indicated that a substantial percentage of 1975 vehicles manufactured for sale outside of California will be equipped with catalysts.

38 Fed.Reg. 28301 (October 12, 1972).

## II. THE ISSUES

Numerous objections to the regulations are raised.[19] In summary, petitioners allege: (A) that the Statement fails to include "specific findings" supporting the Administrator's many regulatory decisions; (B) that the 0.05 gram per gallon ceiling on lead in "unleaded gasoline" is not sufficiently justi-

fied in the Statement or supported by the record; (C) that the affirmative marketing requirement for unleaded gasoline is not authorized by the Clean Air Act and is, in addition, not sufficiently justified in the Statement or supported by the record; (D) that the imposition of vacarious liability is not authorized by the Clean Air Act or by the Constitution and is, in addition, not sufficiently justified in the Statement or supported by the record; and (E) that EPA was required, and failed, to file an "environmental impact statement" for the Regulations under Section 102(2)(C) of the National Environmental Policy Act of 1969.[20]

A. *"Findings" Under Section 211(c)(2)(B) and (C) of the Clean Air Act*

■ Section 211(c) of the Clean Air Act establishes a framework for "informal rule-making," an enterprise for which the usual scope of judicial review is prescribed by Section 10(e)(2)(A)– (D) of the Administrative Procedure Act (APA),[21] and for which minimum procedural requisites are established by Section 4 of the APA.[22] Being silent on the scope of judicial review,[23] the Clean Air Act incorporates the APA's mandate that agency "action, findings, and conclusions" be struck down if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Section 10(e)(2)(A) of the APA. But, like many recent grants of rulemaking authority,[24] the Clean Air Act itself prescribes certain novel procedural

18. Testimony of Edward N. Cole, President, General Motors Corp., May 30, 1973, stenographic transcript pp. 8 & 10, supplement to the record pp. 3557–3558.

19. Petitioners in No. 73–1117 are large and well known oil companies. They object only to the vicarious liability provisions in the Regulations, point D in text. Petitioners in Nos. 73–1118 & 73–1150 are smaller and less well known oil companies. They join in all of the objections outlined in text.

20. Pub.L. 91–190, Jan. 1, 1970, 83 Stat. 853, 42 U.S.C. § 4332(2)(C) (1970).

21. 5 U.S.C. § 706(2)(A)–(D) (1970).

22. 5 U.S.C. § 553 (1970).

23. The Clean Air Act provides only that review shall be available exclusively in the United States Court of Appeals for the District of Columbia Circuit. 42 U.S.C. § 1857h–5(b)(1) (1970).

24. *See* examples listed in Associated Industries of New York State, Inc. v. U. S. Dept. of Labor, 2 Cir., 487 F.2d 342, 345 n. 1 (1973); Hamilton, Procedures for the Adoption of Rules of General Applicability: The Need for Procedural Innovation in Adminis-

requisites.[25] Of these the most important for our purposes are the "findings" requirements in Section 211(c)(2). Section 4(c) of the APA provides merely that "the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." To this duty Section 211(c)(2) adds a requirement that certain "findings" be published in conjunction with promulgation of fuel regulations:

(B) No fuel or fuel additive may be controlled or prohibited by the Administrator pursuant to clause (B) of paragraph (1) except after consideration of available scientific and economic data, including a cost benefit analysis comparing emission control devices or systems which are or will be in general use and require the proposed control or prohibition with emission control devices or systems which are or will be in general use and do not require the proposed control or prohibition. On request of a manufacturer of motor vehicles, motor vehicle engines, fuels, or fuel additives submitted within 10 days of notice of proposed rulemaking, the Administrator shall hold a public hearing and publish findings with respect to any matter he is required to consider un-

der this subparagraph. Such findings shall be published at the time of promulgation of final regulations.
Section 211(c)(2)(B).

(C) No fuel or fuel additive may be prohibited by the Administrator under paragraph (1) unless he finds, and publishes such finding, that in his judgment such prohibition will not cause the use of any other fuel or fuel additive which will produce emissions which will endanger the public health or welfare to the same or greater degree than the use of the fuel or fuel additive proposed to be prohibited.
Section 211(c)(2)(C).

Petitioners construe these provisions as requiring that the Administrator's Statement contain findings which are "specific" in character and which are directed to each of the decisions and determinations embodied in the Fuel Regulations. A study of the language and history of the provisions has persuaded us that they cannot fairly be construed in this fashion.

We consider first the question of specificity. The two provisions speak only of "findings," not of "specific findings." The House version of the legislation required specificity[26]; the Senate version

---

trative Rulemaking, 60 Calif.L.Rev. 1276, 1315 (1972) ; H. Friendly, Federal Jurisdiction: A General View 34–35 & n. 108 (1973).

25. For example, § 211(c)(2)(B) requires a "public hearing" on the Agency's proposed fuel regulations, while § 4(c) of the APA requires only that an agency "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." But this innovation is not a momentous one. The Administrator remains able to regulate on the basis of information drawn from sources other than the public hearing. See § 211(c)(1) & (3) of the Clean Air Act. Because the hearing requirement is not accompanied by a requirement that rules "be made on the record after opportunity for an agency hearing," compare § 4(c) of the APA, EPA need not adopt the "adjudicative" procedures listed in §§ 7 & 8 of the APA, 5 U.S.C. §§ 556 & 557 (1970). See United

States v. Florida East Coast R. Co., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973), and United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed. 2d 453 (1972). For the same reason EPA's rules are not reviewable as to whether they are supported by "substantial evidence." See § 10(e)(2)(E) of the APA.

26. Section 8(a) of H.R. 17255 would have added the following relevant provisions to the Clean Air Act:
[Section 210] (f)(1) The Secretary may, on the basis of specific findings made in accordance with subsection (g), establish standards respecting the composition or the chemical or physical properties of any fuel or fuel additive by specifying limitations on (or providing for elimination of) ingredients (including additives) or on the physical or chemical characteristics of any fuel or class of fuels (A) if any emission products of such fuel or fuel additive will endanger the public health or welfare, or (B) if such fuel or fuel additive will

did not.[27] The Conference Committee on the Clean Air Act Amendments of 1970 adopted the Senate's preference for the unqualified noun. The Committee's decision was a deliberated one and was meant to have significance. Advocates of the House version had viewed the specificity requirement as a major limitation on EPA's regulatory power over fuels.[28] The Conference Committee's preference was for simplicity and workability. In reporting the Committee's decision to the Senate Senator Muskie stated:

> While the conference substitute specifies procedures under section 211 which the Administrator will use in

determining whether to prohibit or control fuels or fuel additives, the conference committee wishes to call the Administrator's attention to the relationship between his functions under this section and the emission deadlines stipulated in Section 202. It is not the intent of the Congress to create a cumbersome, time consuming administrative procedure which will delay necessary controls on fuels and fuel additives required to meet these deadlines.

Neither is it the intention of the Congress to lock the Administrator into a rigid economic interpretation of the cost benefit analysis specified in this section in making his determina-

---

impair to a significant degree the performance of any emission control device or system which is in general use, or which the Secretary finds has been developed to a point where in a reasonable time it will be in general use, on a significant number of motor vehicles or motor vehicle engines.

(2) For the purpose of carrying out such standards the Secretary may prescribe regulations prohibiting the manufacture for sale, the sale, the offering for sale, or the delivery of any fuel or fuel additive unless it is in conformity with such standards as may be applicable to it.

 \* \* \* \* \*

[Section 210(g)] (2) Any standards pursuant to clause (B) of subsection (f) (1) shall be established by the Secretary on the basis of specific findings derived from scientific evidence, including a cost-benefit analysis comparing emission control devices or systems which are or will be in general use and require the proposed standard, with emission control devices or systems which are or will be in general use and do not require the proposed standard.

*See* 116 Cong.Rec. (Part 14) 19227 (House) (June 10, 1970).

27. S. 4358 would have added the following relevant provisions to the Clean Air Act:

[Section 212] (c) (1) The Secretary may from time to time on the basis of information obtained under subsection (b) of this section or other information available to him, by regulation control or prohibit the introduction into commerce of any fuel or fuels for use in vehicle engines if the combustion or evaporation of such fuel produces emissions which endanger the public health or welfare, or if such emissions prevent operation of effective

systems for the control of emissions from any vehicle or vehicle engine which the Secretary finds would otherwise conform to standards promulgated pursuant to section 202 of this Act.

(2) Except for fuels the combustion or evaporation of which produce emissions that endanger the public health, the Secretary shall, after public hearings and prior to controlling or prohibiting the introduction into commerce of any fuel, find and publish such finding that control or prohibition of such fuel is necessary for the achievement of an effective program of emission control to meet the standards established by section 202(b) of this Act or that such control or prohibition is necessary to achieve an economic alternative in emissions control over the lifetime of the vehicle as established in section 207 of this Act, or that such control or prohibition is necessary for the effective use of an emission control device certified pursuant to section 211 of this Act, or that such control or prohibition is necessary to protect the general welfare.

(3) The Secretary shall not prohibit the use of any fuel unless he finds, and publishes such finding, that such prohibition would not cause the use of any other fuel which will produce emissions which will endanger the public health or welfare to the same or greater degree.

*See* S.Rep.No.91–1196, *supra* note 4, at 117–118.

28. *See* H.R.Rep.No.91–1146, 91st Cong. 2d Sess. (Committee on Interstate and Foreign Commerce), at 13 (July 3, 1970). *See also* the remarks of Representative Staggers, floor manager of the House version of the legislation, at 116 Cong.Rec. (Part 14) 19229–19230 (House) (June 10, 1970).

tion to prohibit or control fuels or fuel additives.

Rather, the conference committee wishes to call the attention of the Administrator to the broad environmental, esthetic and health considerations underlying the enactment of this legislation which should be kept in mind in making these determinations.[29]

Senator Muskie was a key legislator in drafting the Clean Air Act Amendments, and his uncontradicted views on the meaning of these provisions are entitled to significant weight. *See* Portland Cement Ass'n v. Ruckelshaus, 158 U.S.App.D.C. 308, 314–315, 486 F.2d 375, 381–382 (1973). We are satisfied that Congress wished the Administrator, and *a fortiori* the reviewing courts, to read the "findings" requirements of Section 211(c)(2)(B) and (C) in light of that imperative need for administrative flexibility and expedition which we have already recognized as coloring EPA's statutory duty to state the "basis and purpose" of its regulations.[30] Findings there must be, but they need not be "specific" in the sense of being detailed or voluminous.

We next inquire into the subject matter of the "findings" requirements in Section 211(c)(2)(B) and (C). What is it that EPA is required to find? Petitioners offer an expansive answer: The statute requires publication of distinct "findings" with respect to every significant decision and deter-

mination made in the course of regulating fuels; every choice and judgment embodied in the regulations needs the support of stated findings. This being a matter of first impression, petitioners' thesis requires a rather lengthy exploration.

When—as is the usual case—findings are required in the context of an administrative adjudication, there is no need to ask what the requirement means. An adjudication typically involves a single, ultimate determination, the agency's sole task being to reason from raw evidence to a final conclusion of a mixed legal-factual character, usually framed in statutory language. For instance, an agency will be asked to determine whether the evidence available on a public utility's rate practices shows behavior that is "unreasonable" or "unduly discriminatory." The agency's "findings" are simply those "basic" or "intermediate" conclusions of fact by which it resolves evidentiary disputes and from which it moves, in a final step, to the ultimate statutory decision. *See generally* 2 K. Davis, Administrative Law Treatise § 16.06 (1958).

In rule-making, however, an agency's task is not to test raw evidence against a single, pre-established standard; rather the agency is to fashion a host of new legal standards—regulations—having prospective effect. A rule-making agency makes not one but dozens of "ultimate" decisions—not only because a set

29. 116 Cong.Rec. (Part 32) 42386 (Dec. 18, 1970).

30. In Kennecott Copper Corp. v. EPA, 149 U.S.App.D.C. 231, 234–235, 462 F.2d 846, 849–850 (1972), we stated:
 * * * We are not to be taken as specifying that the agency must provide the same articulation as is required for orders or regulations issued after evidentiary hearings. * * * We are keenly aware of the need to avoid procedural strait jackets that would seriously hinder this new agency in the discharge of the novel, sensitive and formidable, tasks entrusted to it by Congress. This concern is emphasized by the fact that in the 1970 Amendments Congress was significantly concerned with expedition and avoidance of previous cumbersome and time-consuming procedures in effect under prior law.
 The provision by Congress of only informal rule-making, as a preliminary to the issuance of standards, and the contemplation of expedition, yield as reasonable corollaries some latitude in the requirement for delineation of approach. * * * Particularly as applied to environmental regulations, produced under the tension of need for reasonable expedition and need for resolution of a host of nagging problems, we are loath to stretch the requirement of a "general statement" into a mandate for reference to all the specific issues raised in comments.
 (Footnotes omitted.)

of regulations has many provisions, but also because adoption of any one provision constitutes a simultaneous rejection of many possible alternatives. Few if any of these "ultimate" decisions will depend on factual conclusions of the sort conventional in adjudication. Looking to the future, and commanded by Congress to make policy, a rule-making agency necessarily deals less with "evidentiary" disputes than with normative conflicts, projections from imperfect data, experiments and simulations, educated predictions, differing assessments of possible risks, and the like. The process is *quasi*-legislative in character, and one will search it in vain for those intermediate "findings" of fact which mark the midway point in an adjudicator's linear march from raw evidence to single, ultimate conclusion. *See generally* Industrial Union Department, AFL–CIO v. ·Hodgson, 162 U.S.App.D.C. ——, —— ——, 499 F.2d 467, 472–476, 488 (1974); Automotive Parts & Accessories Ass'n v. Boyd, 132 U.S.App.D.C. 200, 205–207, 407 F.2d 330, 335–337 (1968).

For these reasons we think petitioners' expansive reading of the "findings" requirements in Section 211(c)(2)(B) and (C) is inherently unrealistic. To require findings of a rule-making agency without specifying what factual predicates are to be found or which administrative decisions are to be supported by findings would be to invite endless confusion and great uncertainty, particularly at the stage of judicial review. Judge Friendly recently confronted a similar dilemma in Associated Industries of New York State, Inc. v. United States Dept. of Labor, 2 Cir., 487 F.2d 342 (1973), involving a statute, the Occupa-

tional Safety and Health Act, which subjected certain rule-making by the Secretary of Labor to judicial review under the "substantial evidence" standard. After observing that the bearing of factual "evidence" on rule-making is unclear at best, *id.* at 349–350, Judge Friendly warned:

> Courts may well end up doing much less than Congress intended or, a more likely and graver threat in these days of judicial activism, much more than Congress had wished.

*Id.* at 354.

Fortunately, the findings requirements in Section 211(c)(2)(B) and (C) are capable of an alternative construction which avoids uncertainty and confusion. In our judgment Section 211(c)(2)(C) calls on EPA to answer a particular factual question, while Section 211(c)(2)(B) requires that particular factual determinations be made concerning the threshold necessity of embarking upon fuel regulation. Because these findings requirements are reasonably precise and comprehensible, they are compatible with the mechanics of rule-making and with the exigencies of judicial review.

Consider first Section 211(c)(2)(C). It provides that, before a fuel "may be prohibited," the Administrator must publish a "finding, that in his judgment such prohibition will not cause the use of any other fuel or fuel additive which will produce emissions which will endanger the public health or welfare to the same or greater degree than the use of the fuel or fuel additive proposed to be prohibited." The Administrator's Statement makes a finding to this effect.[31] Petitioners have presented us with no

---

31. At the time of the proposed rule making, the Administrator concluded that the proposed control of the use of lead additives and phosphorus-containing additives in lead-free gasoline would not cause the use of any other fuel or fuel additive that will produce emissions which will endanger the public health or welfare to the same or greater degree. Since that time, additional information has been developed which further supports the Administrator's ear-

lier conclusion. This additional information and the basis for the original finding are set forth in a paper entitled "Effects of Reduced Use of Lead in Gasoline on Vehicle Emissions and Photochemical Reactivity" (with addendum). Copies of this paper are available from the Publications Section, Environmental Protection Agency, 401 M Street SW., Room 238W, Washington, DC 20460.

38 Fed.Reg. 1254 (Jan. 10, 1973).

reason to think the finding arbitrary or capricious.[32]

■ The "findings" requirement in Section 211(c)(2)(B) calls for somewhat closer attention. It commands the Administrator to "publish findings with respect to any matter he is required to consider under this subparagraph" (*i. e.* under 211(c)(2)(B)). The "matter[s]" he must "consider" are

> available scientific and economic data, including a cost benefit analysis comparing emission control devices or systems which are or will be in general use and require the proposed control or prohibition with emission control devices or systems which are or will be in general use and do not require the proposed control or prohibition.

Thus in a literal sense the provision requires "findings with respect to" the *actual items of data* which the Administrator must "consider." But we do not take this to mean that EPA is to produce an aimless commentary on the raw evidence presented to it.[33] There is an accepted distinction in the law between findings and a rambling discussion of evidence. *See* 2 K. Davis, *supra*, § 16.-06. Findings are generally required in order to illuminate the empirical bases of an agency's decision-making and this,

we assume, is also the objective of the requirement in Section 211(c)(2)(B).

While the provision does not expressly specify the administrative decision in support of which findings are necessary, this emerges with reasonable clarity from the structure and legislative history of the provision. Section 211 (c)(2)(B) is centrally concerned with EPA's *threshold* determination *whether or not* to regulate a particular fuel or additive. In effect, the provision establishes a rebuttable presumption that the Agency should maintain a *laissez faire* posture with regard to fuel regulation.[34] To rebut the presumption the Agency must determine, through consideration of "available scientific and economic data, including a cost benefit analysis," that the emission standards established under Section 202 of the Act cannot be achieved in acceptable fashion by relying on emission control devices in "general use" which "do not require the proposed control or prohibition." The "findings" arrived at in making this determination must be published. The findings are to show why regulation, *as opposed to no regulation,* is necessary or otherwise advisable.[35] These findings constitute a condition precedent to embarking upon the exercise of regulatory power. It does not follow that

32. Petitioners do complain that, since the Regulations were issued, some evidence has accumulated to the effect that catalytic devices may themselves emit certain metallic particles which may constitute a hazard to public health. The Agency assures us that research is actively continuing in this area and that the problem appears to be minor and manageable. In our view, the matter is not properly addressed in this proceeding. Section 211(c)(2)(C) requires findings only with respect to the possible dangers caused by use of alternative *fuels.*

Under § 202(a) the Administrator has clear authority to regulate emissions from catalytic devices themselves. Failure to act might in some circumstances subject the Administrator to a citizen's suit under 42 U.S. C. § 1857h-2(a)(2) (1970). In addition, the Administrator must annually report to Congress "with respect to the development of systems necessary to implement the emission standards established pursuant" to § 202.

*See* § 202(b)(4). Accordingly, we have no doubt that the emission problem alleged by petitioners will get adequate attention and a full public airing.

33. It should be noted that even petitioners do not urge this literalistic reading of the provision.

34. Thus § 211(c)(2)(B) provides that "[n]o fuel or fuel additive may be controlled or prohibited * * * *except after*" a "consideration" of certain data, from which "consideration" the required findings are to be derived. (Emphasis added.)

35. Findings concerning the relative merits of emission control devices which do and which do not need a regulated fuel are of course directly pertinent to the decision whether or not to regulate a fuel. Such findings have little if any pertinence to the detailed decisions made in actually formulating the regulation.

findings are also required to support the many subsequent and detailed decisions made during the exercise of that power. Section 211(c)(2)(B) involves a clear reference to the threshold question of whether or not to regulate, but implies no reference we can perceive to the myriad issues raised by the subsequent question of how to regulate. The findings requirement appears, therefore, to be an initial barrier which the Agency must scale, not a series of hurdles strung throughout the whole course of the rule-making process.[36]

The legislative history of the provision supports this interpretation. In discussing the Conference Committee's bill, Senator Muskie spoke of "procedures under section 211 which the Administrator will use in determining *whether* to prohibit or control fuels or fuel additives."[37] (Emphasis added.) The Senate committee explained its version of the legislation in similar terms.

> The Committee believes that automobile and petroleum industries should be given the greatest possible latitude in developing an effective low emission technology. Therefore, before the Secretary made any decision to prohibit or limit the use of a fuel to facilitate emission control, he would be required to hold public hearings and make and publish *a finding that such a prohibition is necessary.* * * *[38]

(Emphasis added.) While adverting to the later-rejected notion of "specific findings," the House committee also focused on the threshold determination whether or not to embark on fuel regulation.

> Before imposing such [fuel] limitations the Secretary is required to make certain *specific findings as to the necessity of the imposition of such limitations.*[39]
>
> * * * * * *
>
> In authorizing the Secretary to prescribe limitations for automotive fuel ingredients, the committee has conditioned the Secretary's authority by requiring specific findings based on specified evidence. The committee has done this for the purpose of assuring that such limitations will not be lightly imposed *if other equally satisfactory alternatives are available.*[40]

(Emphasis added.)

■■ Therefore, at the core of Section 211(c)(2)(B) we find a requirement that the Administrator state findings, drawn from a study of emission control devices in or near "general use," to the effect that fuel regulation is a necessary or otherwise advisable component in the Agency's overall strategy to meet the Section 202 emission standards. On this score the Statement accompanying the Fuel Regulations is candid and, we think, adequate. We quote relevant portions in the margin.[41] The Adminis-

---

36. *Compare* in this regard § 8(c) of the APA, 5 U.S.C. § 557(c) (1970), which requires "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record * * *." As noted earlier, this provision does not apply to EPA's rule-making under the Clean Air Act. *See* note 25 *supra.*

37. *See* note 29 *supra* and accompanying text.

38. *See* S.Rep.No.91–1196, *supra* note 4, at 34. The Committee went on to describe the findings requirement as follows:
> The Secretary [now the Administrator of EPA] would have to find that such a prohibition or control on fuels benefits the public either by enabling use of a more effective emission control system than would

otherwise be available, or by providing a less costly emission control system if two systems of equal effectiveness are developed. * * *
> *Id.*

39. H.R.Rep. No. 91–1146, *supra* note 28, at 4.

40. *Id.* at 6.

41. When the proposed regulations were published, the Administrator had determined that emission products of lead and phosphorus additives would impair to a significant degree the performance of emission control systems which include catalytic converters that motor vehicle manufacturers are developing to meet the 1975–76 motor vehicle emission standards and that

trator expressly found that catalytic converters require a regulated fuel—unleaded gasoline; that converters will be in general use in the 1975 model year; and that no other emission control device or system will then be in general use. Taken together, these findings negative any possibility of meeting the 1975 emission standards without fuel regulation. These findings are amply supported by the record.

■ Petitioners concede that leaded gasoline poisons converters. While petitioners argue that suspension of the 1975 standards will effectively restrict use of the converters to California, the evidence is otherwise, indicating "general use" nationwide. The Administrator directly addressed this matter in his April 11 decision on the suspension. He concluded that fuel regulation remained necessary because California cars "will undoubtedly travel to other parts of the country" and because converters would also be fitted "on a significant number of vehicles sold in the other 49 States."[42] These findings were reasonable on the record before him, and they have been dramatically vindicated by subsequent testimony of high officers of the Ford Motor Company and General

Motors; these corporations plan to make extensive, nationwide use of converters in the 1975 model year.[43] The statute speaks of "general use," not of universal or invariable use.

■ Finally, petitioners contest the Administrator's finding that the catalytic converter is the only emission control device relevant, at this time, to the decision whether or not to regulate fuels. It is true that there are other devices and systems in the testing stage, that some of these may be able to operate on leaded gasoline, and that one or another of these systems may some day supplant converters for reasons of cost or efficiency. The Administrator examined these matters in his April 11 decision, and concluded that American automakers will have to rely on converters for another five years.[44] Section 211(c)(2)(B) requires a cost-benefit comparison only between those devices or systems which are in or near "general use." Until a device or system reaches that stage, it obviously cannot be a viable factor in deciding whether or not to regulate fuels in order to meet the Section 202 schedule for reduced emissions. Petitioners refer us to no evidence indi-

are likely to be in general use if lead and phosphorus additives are controlled or prohibited for use in certain motor vehicle gasolines. This determination was based upon consideration of the available scientific and economic data including a cost-benefit analysis comparing motor vehicle emission control devices or systems which are or will be in general use and require control or prohibition of lead additives in gasolines with emission control devices or systems which are or will be in general use and do not require such control or prohibition of those additives. After identifying the emission control systems or devices under consideration by automobile manufacturers for meeting the 1975-76 standards, the Administrator determined that one system, the catalytic converter, would be in general use in the 1975 model year. Accordingly, a comparison of systems or devices was not feasible. Since publication of the proposed rule making, additional information on this subject has been submitted to the Agency during public hearings on the suspension of 1975

model year light duty motor vehicle emission standards, and the lead regulations hearings and comment period. This information provides further support for the Administrator's determination.

Therefore, the proposed provision for the general availability by July 1, 1974, of essentially lead-free and phosphorus-free gasolines of an octane quality suitable for 1975 and subsequent model year light duty vehicles is included in the final regulations. Copies of the cost-benefit analysis referred to above, entitled Aerospace Report, PB–205–981, are available for $4.50 each from National Technical Information Service, Department of Commerce, 5285 Port Royal Road, Springfield, VA 22151. 38 Fed.Reg. 1254.

42. The April 11 Decision, 38 Fed.Reg. at 10327.

43. See notes 17 & 18 supra and accompanying text.

44. The April 11 Decision, 38 Fed.Reg. at 10326.

cating that a non-converter device or system will be in or near general use in the 1975 or 1976 model years. When and if non-converter technology approaches general use, continuation of these Fuel Regulations will require that the Agency undertake the cost-benefit comparison among emission control systems outlined in Section 211(c)(2)(B). Until then, however, no such comparison is necessary.[45]

In sum: By showing that fuel regulation is necessary to meet the Section 202 schedule for reduced emissions, and that the proposed regulation will not cause use of an equally harmful fuel or additive, the Administrator's statement has, in our judgment, met the "findings" requirements in Section 211(c)(2)(B) and (C). Petitioners argue strenuously that Section 211(c)(2)(B) additionally requires "findings" with respect to the Agency's detailed regulatory decisions, e. g. the decisions to set the lead content ceiling at 0.05 gram per gallon, to require marketing of unleaded gas, and to impose vicarious liability on refiners and end-point distributors. As earlier explained, this view depends on a broad construction of Section 211(c)(2)(B) which is rendered implausible by the verbal structure and legislative history of the provision, by Congress' rejection of the term "specific findings," by the legislative mandate for expeditious decision-making, and by the inherent nature of the rule-making process.

We acknowledge that Section 211 (c)(2)(B) is awkwardly drafted, and that this very awkwardness may signal an unarticulated congressional intent that the Administrator publish those factual determinations which crucially affected the shape of his regulations.[46] But this possibility need not detain us, for so much would be required in any case by Sections 4 and 10 of the APA.

■ The "basis and purpose" statement required by Section 4(c) of the APA must be sufficiently detailed and informative to allow a searching judicial scrutiny of how and why the regulations were actually adopted. Automotive Parts & Accessories Ass'n v. Boyd, *supra*. In particular, the statement must advert to administrative determinations of a factual sort to the extent required for a reviewing court to satisfy itself that none of the regulatory provisions were framed in an "arbitrary" or "capricious" manner. Portland Cement Ass'n v. Ruckelshaus, *supra*, 158 U.S.App.D.C. at 323–334, 486 F.2d at 390–401; International Harvester Co. v. Ruckelshaus, *supra*, 155 U.S.App.D.C. at 425–443, 478 F.2d at 629–647; Kennecott Copper Corp. v. EPA, 149 U.S.App.D.C. 231, 234–236, 462 F.2d 846, 849–851 (1972); City of Chicago v. FPC, 147 U.S.App.D. C. 312, 322–326, 458 F.2d 731, 741–745 (1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972). In light of this jurisprudence, which has developed without the aid of a statutory

---

45. For this reason the Statement was not required to address petitioners' contention that catalysts reduce fuel economy and therefore threaten to worsen the nation's "energy crisis." Again, these matters were fully addressed in the April 11 Decision, 38 Fed.Reg. at 10325–10326. The overall issue there at stake was whether emission standards requiring use of catalytic converters were in the public interest under § 202 of the Clean Air Act. The Administrator's conclusion in the affirmative was subject to direct judicial review, for it was made upon remand from this court in International Harvester Co. v. Ruckelshaus, 155 U.S.App. D.C. 411, 478 F.2d 615 (1973). But the Administrator's conclusion is not subject to collateral attack in the present proceeding.

In promulgating fuel regulations, the Agency may take as a fixed given any emission standards properly issued under § 202 of the Act. The general merits and infirmities of catalytic converters are relevant to the Administrator's decision to regulate fuels only if there exist *other* control devices, in or near general use, which are also capable of meeting the emission standards issued under § 202.

46. As earlier noted, the awkwardness derives from the provision's literal command that the Administrator publish "findings with respect to * * * available scientific and economic data," rather than with respect to a particular administrative decision to be made on the basis of the available data.

requirement for "findings," we cannot perceive what would be added to the responsibilities of the Administrator, or of this court, by reading into Section 211(c)(2)(B) a diffuse and ambiguous congressional preference for fact-finding.

No matter how broadly we might read Section 211(c)(2)(B), the hard truth would remain that a great deal of EPA's rule-making could not, as a matter of simple logic, be "supported" by "findings." This court, per Judge McGowan, recently addressed this precise problem in construing the requirement in the Occupational Safety and Health Act (OSHA) that the Secretary of Labor's rule-making be supported by "substantial evidence." Industrial Union Department, AFL–CIO v. Hodgson, *supra.* We quote the opinion at some length, for it cogently explains the impracticality of the views advanced by petitioners in the present litigation.

> * * * [I]n a statute like OSHA where the decision making vested in the Secretary is legislative in character, there are areas where explicit factual findings are not possible, and the act of decision is essentially a prediction based upon pure legislative judgment, as when a Congressman decides to vote for or against a particular bill.
>
> * * * * * *
>
> * * * [S]ome of the questions involved in the promulgation of these standards are on the frontiers of scientific knowledge, and consequently as to them insufficient data is presently available to make a fully informed factual determination. Decision making must in that circumstance depend to a greater extent upon policy judgments and less upon purely factual analysis. Thus, in addition to currently unresolved factual issues, the formulation of standards involves choices that by their nature require basic policy determinations rather than resolution of factual controversies. Judicial review of inherently legislative decisions of this sort is ob-

viously an undertaking of different dimensions.

> * * * * * *
>
> * * * [The Secretary's] decision to adopt, over strong employer objection, a relatively low limit [on allowable levels of asbestos dust in places of employment] * * * rests in the final analysis on an essentially legislative policy judgment, rather than a factual determination, concerning the relative risks of underprotection as compared to overprotection.
>
> Regardless of the manner in which the task of judicial review is articulated, policy choices of this sort are not susceptible to the same type of verification or refutation by reference to the record as are some factual questions. Consequently, the court's approach must necessarily be different no matter how the standards of review are labeled. * * *
>
> * * * [The "substantial evidence" provision] is surely not to be taken as a direction by Congress that we treat the Secretary's decision making under OSHA as something different from what it is, namely, the exercise of delegated power to make within certain limits decisions that Congress normally makes itself, and by processes, as the courts have long recognized and accepted, peculiar to itself. A due respect for the boundaries between the legislative and the judicial function dictates that we approach our reviewing task with a flexibility informed and shaped by sensitivity to the diverse origins of the determinations that enter into a legislative judgment.

162 U.S.App.D.C. at ––––––, 499 F.2d at 474–475. (Footnotes omitted.)

■ Sharing these views, we read Section 211(c)(2)(B) as incorporating the commonsense approach which the courts have developed in applying Section 4(c) of the APA. Where EPA's regulations turn crucially on factual issues, we will demand sufficient attention to these in the statement to allow the

fundamental rationality of the regulations to be ascertained. Where, by contrast, the regulations turn on choices of policy, on an assessment of risks, or on predictions dealing with matters on the frontiers of scientific knowledge, we will demand adequate reasons and explanations, but not "findings" of the sort familiar from the world of adjudication.

**B.** *The 0.05 Gram/Gallon Lead Content Ceiling*

In the margin we set out the Statement's justification for selecting 0.05 gram/gallon as the lead content ceiling for "unleaded gasoline." [47] Petitioners allege that the Agency has failed to show (1) that a higher ceiling would prove harmful to converters or (2) that the oil industry can meet the prescribed ceiling. Petitioners addditionally contend (3) that the rationality of the pre-

scribed ceiling must remain in doubt until the Agency announces the "test methods" it will use in measuring trace levels of lead. We are unpersuaded by these arguments.

 (1) The Agency heard credible and uncontradicted testimony, informed by experimental evidence, to the effect that converters are poisoned by gasoline which *averages* more than 0.03 gram/gallon of lead.[48] The Statement finds that a 0.05 gram/gallon ceiling is necessary to keep average lead content at or below 0.03 gram/gallon. The question before us is whether this conclusion was arbitrary or capricious, given that petitioners had urged the adequacy of a 0.07 gram/gallon ceiling, a figure once recommended as a definition of "unleaded gasoline" by the American Society for Testing and Materials (ASTM).[49]

47. The regulations as proposed provided that the lead content of unleaded gasoline not exceed 0.05 gram of lead per gallon. This maximum trace lead level is based upon the determination that it would provide adequate protection for catalyst emission control devices and that delivery of unleaded gasoline meeting this specification is within the capability of the petroleum industry.

Most of the auto manufacturers initially asserted that the standard should be set at a maximum of 0.03 gram per gallon or less to prevent impairment of the effectiveness of the catalytic emission control devices. More recently, several manufacturers have stated that the proposed trace lead standard of 0.05 gram per gallon would be acceptable if such a standard assured that the average lead content of unleaded gasoline were 0.03 gram per gallon.

Spokesmen for the petroleum industry urged that the trace lead standard be set at 0.07 gram per gallon, the specification for unleaded gasoline established by the American Society for Testing and Materials. This specification was chosen on the basis of: (a) The capacity of the distribution system to deliver gasoline with low trace lead levels and (b) the reproducibility of the test methods. The experience of the petroleum industry as a whole in delivery of unleaded gasoline was conceded to be limited. The one company with substantial experience in the distribution of unleaded product is currently able to meet a 0.05 standard most of the time.

The regulations provide for the general availability of a lead-free and phosphorus-free gasoline with specified trace lead levels of 0.05 gram of lead per gallon. It is the Administrator's determination that without regulatory action requiring retail outlets to market at least one grade of such gasoline, availability of that product to the general public in all areas of the country would be uncertain, and may not be sufficient to assure the protection of catalytic control devices. This regulation will determine the range of trace lead in gasoline which will be available to the consuming public for use in motor vehicles with control devices (e. g., from 0 gram lead to 0.05 gram lead). Based on the available data on marketing of unleaded gasolines, the Agency projects that a 0.05 gram of lead per gallon maximum will result in a 0.03 gram per gallon average lead content. Since the Agency's motor vehicle certification regulations require that gasoline generally available at retail outlets be used in vehicle certification tests, 1975 model year vehicle certification testing will be required to be conducted using gasolines having a minimum lead content of 0.03 gram per gallon.
38 Fed.Reg. 1254.

48. *See, e. g.,* "Statement by Dr. Kenneth I. Jagel," Joint Appendix at 192–210.

49. *See* Aerospace Report, *supra* note 3, at § 5.1.2.

742

For two reasons we must show considerable deference to the Agency's conclusion. First, the conclusion is in the nature of a prediction for which supporting data is necessarily sparse or absent. The average figure resulting from adoption of any given ceiling figure will depend entirely on how the oil companies respond to the chosen ceiling figure. If the companies decide to maintain lead levels well below the ceiling, the average will also be well below the ceiling; if the companies "hug" the ceiling, the average will be considerably higher. Exactly how the companies will choose to behave cannot be known before the Regulations go into effect. To a large degree, therefore, we are dealing with an informed hunch or guess. EPA is closer to the scene, and has more expertise in these matters, than the courts, and we must therefore hesitate before replacing the Agency's predictions with our own. The second reason for judicial deference is that the 0.05 gram/gallon ceiling expresses the Agency's attitude toward competing risks: If the ceiling is set too high, many converters will be poisoned; if the ceiling is unnecessarily low, the cleanup effort required of the oil industry will be larger than necessary. The Agency's decision therefore "rests in the final analysis on an essentially legislative policy judgment, rather than a factual determination, concerning the relative risks of underprotection as compared to overprotection." Industrial

Union Department, AFL–CIO v. Hodgson, *supra*, 162 U.S.App.D.C. at ——, 499 F.2d at 475.

Turning to the record, we find adequate support for the Agency's decision to select a ceiling figure no higher than 0.05 gram/gallon. The Aerospace Report, cited by EPA, noted that the 0.07 gram/gallon figure proposed by petitioners "was apparently based on refinery and distribution considerations, rather than catalyst life considerations," and that "many of the automakers and catalyst manufacturers have stated that the * * * value of 0.07 gram/gallon is probably too high." [50] The 0.05 gram/gallon figure was characterized either as too high or as the highest figure tolerable by various converter manufacturers.[51] Finally, the Agency closely studied the experience of Amoco, the only oil company presently delivering unleaded gasoline on a large scale. Amoco's product averages 0.03 gram/gallon or less. The company formally sets itself a 0.07 gram/gallon ceiling, but in fact some 92 per cent of its gasoline is at or below 0.05 gram/gallon.[52] Faced with this evidence and testimony, and with the pressing need to ensure that lead content will not average more than 0.03 gram/gallon, EPA did not act arbitrarily or capriciously in selecting a ceiling figure of 0.05 gram/gallon.[53]

(2) Throughout these proceedings the oil companies have expressed doubt

50. *Id.*

51. *Id.*; "Statement Presented by W. Robert Price, Jr.," JA at 232, 235; "Statement by Dr. Kenneth I. Jagel," *supra* note 48, JA at 192, 193.

52. Letter of B. J. Yarrington, President, American Oil Company (Amoco), dated May 9, 1972, JA at 176, 178.

53. Petitioners score the Agency for failing to explain why the regulation did not simply require that lead content average 0.03 gram/gallon or less. We do not think a rule-making agency needs to justify its rejection of each possible alternative to each provision of its regulations. A contrary rule would require "basis and purpose" statements of unconscionable length. Further-

more, in the present case "the necessary articulation of basis for administrative action be discerned by reference to clearly relevant sources other than a formal statement of reasons." Environmental Defense Fund, Inc. v. EPA, 150 U.S.App.D.C. 348, 357, 465 F.2d 528, 537 (1972). The record clearly shows that catalysts can be poisoned by use of a single tankful of gasoline with a particularly high lead content; a regulation which spoke only in terms of average lead content over many tankfuls would thus provide imperfect protection for converters. *See, e. g.,* Aerospace Report, *supra* note 3, at 5–15. And, as a simple matter of logic, it is obvious that a regulation framed in terms of averages would involve higher administrative costs for monitoring stations and detecting violations.

that they can deliver gasoline which always contains 0.05 gram/gallon or less. To support its determination that the 0.-05 gram/gallon ceiling is feasible EPA need not show that the oil companies are already supplying gasoline below the ceiling 100 per cent of the time. On the other hand, the Administrator's latitude for "protection is subject to the restraints of reasonableness, and does not open the door to 'crystal ball' inquiry." Portland Cement Ass'n v. Ruckelshaus, *supra,* 158 U.S.App.D.C. at 324, 486 F. 2d at 391. *See also* International Harvester Co. v. Ruckelshaus, *supra,* 155 U. S.App.D.C. at 425, 478 F.2d at 629. Within these parameters, we are persuaded that the record adequately shows the feasibility of the 0.05 gram/gallon ceiling. As noted above, Amoco already meets the standard with 92 per cent of its product; this is achieved without the inducement of legal compulsion and, indeed, without the benefit of a 0.05 gram/gallon target figure. Furthermore, the Agency was presented with evidence that, in the New York City area, unleaded gasoline available in 55 gas stations was below the 0.05 gram/gallon level in 54 of the stations; in fact, at 98 per cent of the stations the gasoline sampled was below the 0.03 gram/gallon level.[54] The oil companies have pointed to no scientific or technological obstacles to meeting the 0.05 gram/gallon ceiling. Rather, the problem is a straightforward one of cost and effort.[55] The Agency's prediction of feasibility is neither arbitrary nor capricious.

 (3) The Agency deferred promulgating the test methods by which it will detect violations of the 0.05 gram/gallon ceiling.[56] Petitioners argue that the rationality of the ceiling cannot

be determined until the method of measuring it is known. We agree that it would be better practice for the Agency to promulgate its standards and test methods at the same time, but there is no fixed requirement to this effect. We have stated that

a significant difference between techniques used by the agency in arriving at standards, and requirements presently prescribed for determining compliance with standards, raises serious questions about the validity of the standard.

Portland Cement Ass'n v. Ruckelshaus, *supra,* 158 U.S.App.D.C. at 329, 486 F.2d at 396. (Footnote omitted.) Should such a "significant difference" appear upon final promulgation of test methods in these Regulations, the court reviewing those methods may have to regard their promulgation as an effective alteration in the lead content ceiling, which alteration would itself be subject to review. But this is clearly a matter for future proceedings.

 Petitioners also contend that any test methods adopted will involve a certain capacity for statistical error. We fail to appreciate the force of this argument. The possibility of statistical measurement error, which is often unavoidable where regulations set quantitative standards, does not detract from an agency's power to set such standards. It merely deprives the agency of the power to find a *violation* of the standards, in enforcement proceedings, where the measured departure from them is within the boundaries of probable measurement error. Furthermore, if the test methods eventually adopted raise a greater potential for error than is practical or necessary, a reviewing court may order revisions.

54. "Statement by Dr. Kenneth I. Jagel," *supra* note 48, JA at 196.

55. *See, e. g.,* letter of B. J. Yarrington, *supra* note 52, JA at 176. Prediction in the face of technological scientific uncertainties is of course a more difficult task. *Compare* Portland Cement Ass'n v. Ruckelshaus, 158

U.S.App.D.C. 308, 324–325, 486 F.2d 375, 391–392 (1973).

56. *See* 40 C.F.R. § 80.3 (1973). Subsequently, however, the Agency has formally proposed testing procedures. *See* note 9 *supra.* The merits of this proposal are not before us.

## C. *The Affirmative Marketing Requirement*

 The Regulations impose an affirmative duty to sell at least one grade of unleaded gasoline on

> every person who owns, leases, operates, controls, or supervises a retail outlet at which 200,000 or more gallons of gasoline was sold during any calendar year beginning with the year 1971 * * *.

40 C.F.R. § 80.22(b). Petitioners contend that the Clean Air Act does not empower EPA to require marketing of any fuel; they additionally allege that the Statement and the record provide insufficient support for the requirement.

The statute authorizes the Administrator to

> control or prohibit the manufacture, introduction into commerce, offering for sale, or sale of any fuel or fuel additive for use in a motor vehicle or motor vehicle engine * * * (B) if emission products of such fuel or fuel additive will impair to a significant degree the performance of any emission control device or system which is in general use, or which the Administrator finds has been developed to a point where in a reasonable time it would be in general use were such regulation to be promulgated.

Section 211(c)(1). Petitioners construe the affirmative marketing regulation as a "control" on the sale of *unleaded gasoline*. They note that the statute authorizes control only of fuels or additives which "impair * * * the performance of any emission control device or system." According to petitioners, regulations—*i. e.* prohibition or control—may be directed at leaded gasoline, which impairs converters, but not at unleaded gasoline, which does not. This narrow, linguistic argument is open to a similarly narrow and linguistic answer: The affirmative marketing requirement does in fact "control" the sale of *leaded* gasoline, for the regulation provides in effect that the specified retailers may sell no leaded gasoline unless and until they also offer for sale one grade of unleaded gasoline. To so condition the sale of leaded gasoline is surely one way to "control" its sale.

That the term "control" encompasses the power to promote the availability of fuels needed for proper operation of emission control devices is indicated both by the wording of Section 211(c)(1) and by the provision's legislative history. The provision allows fuel regulation whenever the Administrator finds that a device needing special fuel "is in general use, or * * * has been developed to a point where in a reasonable time it *would be in general use were such regulation to be promulgated.*" The emphasized phrase contemplates that fuel regulation may be adopted for the express purpose of *encouraging* wider use of catalytic converters. If the only fuel regulation available to the Administrator were, as petitioners urge, a ban on using leaded gasoline in converter-equipped cars, there could be no direct encouragement given to the use of catalytic converters by automakers and new car buyers. The broad objectives of Section 211(c)(1) would be frustrated.

Petitioners' cramped reading of the statutory phrase "control or prohibit" is directly at odds with the pertinent legislative history. The House bill conferred no power to "control" fuels but only a power of "prohibiting" production or sale of fuels which failed to meet standards established by regulation.[57] Under the House bill EPA could clearly have banned the sale of leaded gasoline for use in converter-equipped cars.[58] In urg-

57. *See* note 26 *supra.*

58. Thus the Administrator could have set a 0.05 gram/gallon lead content "standard" for the "class of fuels" to be used in converter-equipped cars. *See* § 210(f)(1) *proposed, supra* note 26. He could then have prohibited sale of any other sort of fuel for use in such cars. *See* § 210(f)(2) *proposed, supra* note 26.

ing that the Administrator can do no more than this under the enacted statute, petitioners ignore the Senate's contribution. Concerned to enlarge the Administrator's regulatory powers, the Senate added the word "control" to the statute.[59] In explaining this addition, the Senate committee addressed itself directly to the problem of assuring an adequate supply of unleaded gasoline for converter-equipped cars.

\* \* \* Since the use of catalytic mufflers may be essential for compliance with standards established under section 202, the Committee has adopted language permitting the Secretary to control fuels in order to facilitate the use of emission control systems.

\* \* \* \* \* \*

At one time the Committee considered language that would give the Secretary only the authority to "prohibit" a fuel's introduction into commerce. After evaluation, the Committee decided that such authority should also be extended to the "control" of a fuel's introduction into commerce. This authority to "control" the use of fuels is intended to give the Secretary greater flexibility then the authority to "prohibit." For instance, the Committee expects that the Secretary may find it advisable to permit the continued sale of leaded gasolines to allow for the efficient and economic operation of automobiles presently on the highway, even if he finds it necessary to control fuels to assure the availabil-

ity of non-leaded gasolines for other purposes.[60]

The Conference Committee decided for the broad grant of authority proposed in the Senate's bill. It follows, we think, that the Administrator has the power "to assure the availability of non-leaded gasolines" through imposition of an affirmative marketing requirement.

■ We must also reject petitioners' suggestion that the affirmative marketing requirement is insufficiently supported by the Statement and the record.

It is true that the Statement contains no discussion of the 200,000 gallon cutoff point, but in a subsequent and formal announcement the Administrator explained that the cutoff was intended to ensure availability of unleaded fuel at about 45 per cent of the nation's service stations, selling about two thirds of the nation's gasoline, while sparing small retailers the investment costs required to provide unleaded gasoline.[61] The cutoff was proposed by Mobil Oil Corporation, whose formal submission to the Agency contained extensive, industry-wide data on the probable impact of the cutoff.[62]

\* \* \* We do not demand sterile formality. In appropriate cases, if the necessary articulation of basis for administrative action can be discerned by reference to clearly relevant sources other than a formal statement of reasons, we will make the reference.

Environmental Defense Fund, Inc. v. EPA, 150 U.S.App.D.C. 348, 357, 465 F.

59. *See* note 27 *supra.*

60. S.Rep.No.91–1196, *supra* note 4, at 34–35.

61. 38 Fed.Reg. 28301–28302 (Oct. 12, 1973). These statements were published to accompany EPA's proposed deletion of 40 C.F.R. § 80.22(c), which required every owner or operator of six retail outlets to offer at least one grade of unleaded gasoline at no fewer than 60% of such outlets. *See* note 9 *supra.* The Agency explained:

 \* \* \* In response to \* \* \* petitions, EPA has reexamined the availability provisions with particular attention to the geographic dispersion afforded by the present and alternative requirements.

The review conducted by the Agency indicates that the requirement for sale at all retail outlets with annual volume of 200,000 gallons or more provides widespread geographic availability on a county by county basis and includes some 160,000 retail outlets. The review also indicates that the requirement for availability at 60 percent of the retail outlets in chains of 6 or more contributes little to the geographic dispersion of the product but adds between 40,000 and 90,000 retail outlets to the requirements. \* \* \*

38 Fed.Reg. at 28302.

62. Submission of Mobil Oil Corporation, supplement to the record at pp. 3543–3552.

2d 528, 537 (1972) (footnote omitted). No other interested party argued for an alternative cutoff point; the one chosen is facially reasonable.

■ The small, "independent" oil companies have complained that the affirmative marketing requirement may increase the concentratiom of the oil industry. Their theory is that the large refiners may drive the independent distributors and retailers out of business by refusing to sell them unleaded gasoline, either out of spite or out of an inability to meet all gasoline demands in an era of general shortage. We think EPA has given good faith, reasoned consideration to these complaints.[63] The 200,000 gallon cutoff exempts many small retailers from the marketing requirement.[64] Moreover, the Statement makes clear that the Administrator will not demand the impossible and that he will entertain regulatory amendments as changing circumstances require.

> * * * Based on the results of the Agency's evaluation of the independent marketers' supply problems, the Administrator has determined that it would be premature to conclude that gasoline refiners will be unable or unwilling to provide adequate supplies of unleaded gasoline to retail outlets required by these regulations to offer it. If the shortage of unleaded gasoline feared by the independent marketers materializes, this Agency will consider whether additional measures are necessary to assure the general availability of unleaded gasoline.[65]

The Administrator's "wait and see" attitude seems to us cautious and realistic. He is entitled to assume that the Federal Trade Commission and the Antitrust Division of the Department of Justice will prevent brand name refiners from using the affirmative marketing requirement as a cover for anticompetitive practices. And the Administrator has the power to assure that the impact of a general petroleum shortage will not be visited unduly upon those fuels needed to to meet the requirements of the Clean Air Act. See 42 U.S.C. § 1857g(a) (1970).

■ Finally, and most basically, petitioners argue that the Statement and the record are insufficient to support the Administrator's decision to require marketing rather than to rely on free market forces. The Statement meets this issue very tersely but, we think, adequately:

> The regulations provide for the general availability of a lead-free and phosphorous-free gasoline * * *. It is the Administrator's determination that without regulatory action requiring retail outlets to market at least one grade of such gasoline availability of that product to the general public in all areas of the country would be uncertain, and may not be sufficient to assure the protection of catalytic control devices. * * * [66]

Petitioners do not seriously deny that, absent the affirmative marketing requirement, the availability of unleaded gasoline "would be uncertain." No doubt there will eventually be enough converter-equipped cars on the road, and thus a sufficient demand for unleaded gasoline, to induce a conveniently distributed number of the nation's gas stations to provide at least one grade of unleaded fuel.[67] But there is no guarantee, nor

63. If an agency gives such consideration to all relevant factors, its action cannot be said to be arbitrary or capricious. Compare Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Permian Basin Area Rate Cases, 390 U.S. 747, 792, 88 S.Ct. 1344, 20 L. Ed.2d 312 (1968); Pillai v. CAB, 158 U.S. App.D.C. 239, 248–251, 485 F.2d 1018 1027–1030 (1973).

64. See the Agency's statement in proposing deletion of 40 C.F.R. § 80.22(c), 38 Fed. Reg. at 28302.

65. Statement, 38 Fed.Reg. at 1255.

66. Id. at 1254.

67. A retailer must apparently invest about $5,000–$6,000 in an extra pump and other facilities to handle one grade of unleaded gasoline. Submission of Mobil Oil Corporation, supplement to the record at p. 3545. Before the Administrator's April 11 decision to suspend the 1975 emission standards, Mobil projected the percentage of cars on the

even a good reason to believe, that this result would materialize during the transition months of 1975 and 1976. New cars make up only about 10 per cent of the American automobile population. How many of these new cars will be converter-equipped in 1975 is impossible to predict with precision. The plans of the automakers are still developing; car buying habits are in an unsettled state. With the potential demand for unleaded gasoline in this state of flux and doubt, the supply response of the oil industry, and particularly of the retail stations, must necessarily be characterized as "uncertain."

It is petitioners' position that EPA must *accept* this uncertainty rather than impose financial costs on the oil industry through an affirmative marketing requirement. Petitioners' premise is that very few new cars outside California will be converter-equipped; accordingly, petitioners reason, EPA is acting extravagantly and arbitrarily in requiring provision of unleaded gasoline throughout the nation. Rejecting the premise, we reject the conclusion. The Administrator's decision to replace the 1975 emission standards with an "interim" program will not result in a "California only" pattern of converter use. In establishing that program the Administrator stated expressly:

I have not felt constrained to avoid any reliance upon catalysts to enable auto manufacturers to meet the certification requirement [outside California]. I anticipate that for certain

model lines catalysts may be required. The likelihood that a significant number of cars will be distributed across the country equipped with catalysts will supplement the experience derived in California in a beneficial way.[68]

The central purpose of the "interim" program was to provide automakers with an opportunity to perfect and practice mass production and nationwide distribution of converter-equipped cars. Ford has announced that 15 per cent of its non-California models will be converter-equipped; "perhaps all" of General Motors' non-California models will have converters;[69] California vehicles will travel nationwide. If unleaded gasoline is not conveniently available for these vehicles, the new car market may well collapse, the phasing-in of converter technology will be paralyzed, and the Clean Air Act's schedule for reducing air pollution will be severely compromised. When the stakes are this high, the Agency need not gamble. Section 211(c)(1) clearly empowers the Administrator to regulate fuels so as to encourage wider use of emission control devices;[70] *a fortiori*, he may regulate so as to facilitate use of those converters which the automakers have already planned to install. In requiring marketing of unleaded gasoline, the Agency took a conservative course in the face of very substantial risks. This was a considered policy judgment, Industrial Union Department, AFL–CIO v. Hodgson, *supra*, 162 U.S.App.D.C. at ——, 499 F.2d at 475, and it would be irresponsible for

road needing unleaded gasoline in the following manner:

| | |
|---|---|
| 1974 | 1% |
| 1975 | 10% |
| 1976 | 24% |
| 1977 | 36% |
| 1978 | 48% |

*Id.* at 3549. The Independent Refiners' Association of California, Inc. predicted that about 60% of all cars would require unleaded gasoline by 1980. JA at 214.

68. The April 11 Decision, 38 Fed.Reg. at 10324.

69. *See* notes 17 & 18 *and accompanying text.* The Administrator has formally concluded

that "statements by representatives of the motor vehicle manufacturers have indicated that a substantial percentage of 1975 vehicles manufactured for sale outside of California will be equipped with catalysts." 38 Fed.Reg. at 28301.

70. Thus regulation is authorized by § 211(c)(1)(B) whenever a fuel impairs an emission control device or system "which the Administrator finds has been developed to a point where in a reasonable time it would be in general use were such regulation to be promulgated."

us to upset it. Compare International Harvester Co. v. Ruckelshaus, *supra*, 155 U.S.App.D.C. at 429–437, 478 F.2d at 633–641.

### D. *The Vicarious Liability Provisions*

 The Regulations prohibit retailers from introducing leaded gasoline into converter-equipped cars. 40 C.F.R. § 80.22(a). The offense gives rise to a mandatory "civil penalty" of $10,000 per day. 40 C.F.R. § 80.5. If the gasoline illegally introduced was taken from a pump normally used to dispense unleaded gasoline—*i. e.* if the gasoline was "leaded" because of contamination—liability also runs beyond the retailer. 40 C.F.R. § 80.23(a). If the retailer displayed a refiner's trademark, the refiner is vicariously liable for the retailer's offense. 40 C.F.R. § 80.23(a)(1). If no refiner's trademark was displayed, vicarious liability attaches to any distributor who sold the retailer gasoline contained in the storage tank from which the contaminated product was taken. 40 C.F.R. § 80.23(a)(2). The refiner is vicariously liable "irrespective o[f] whether any refiner, distributor, or retailer, or the employee or agent of any refiner, distributor, or retailer may have caused or permitted the violation." No similar language is used in defining the distributor's liability, and it is consequently unclear whether this liability would similarly attach without regard to fault or causation.

Petitioners argue that imposition of strict vicarious liability is beyond the Agency's statutory authority, violative of the Constitution, and without support in the Statement or the record.

The issue separating petitioners and the Agency is relatively narrow. In their briefs, and particularly at oral argument, petitioners conceded that lead contamination of gasoline sold at retail is typically caused in the pre-retail stages of the distribution chain. Given that it would be extremely difficult for the Agency to locate the source of contamination in each instance, petitioners

conceded that a presumption of liability would be reasonable with respect to the retail outlet's immediate supplier, or—in the case of branded gasoline—with respect to the refiner of the outlet's product. But, in petitioners' view, the presumption should be a rebuttable one. If a distributor can show it was not the cause of the contamination, liability should fall elsewhere. Likewise, if a refiner can show that it could not have prevented the contamination, it should not be liable.

Petitioners acknowledged that, while refiners do not own or directly lease or hire all of the facilities making up the distribution network for their branded gasoline, refiners can exert considerable control over the other facilities through contractual agreements providing for regular inspections and for stiff damages upon contamination of the branded product. To this extent petitioners do not challenge the Statement's finding "that the contamination of unleaded gasoline associated with transportation of the product can best be prevented by the major refiners who have control or the ability to control their distribution networks." [71] But petitioners do vigorously assert that a refiner should not be liable if it can show that the contamination of the branded product resulted from an unforeseeable act of vandalism by a third party or from an unpreventable breach of contract by a distributor or jobber.

EPA has, in our judgment, failed to explain why the presumption of liability created by 40 C.F.R. § 80.23(a)(1) & (2) should not be rebuttable in the circumstances outlined by petitioners. While the literal terms of the regulations do not appear to recognize rebuttability, the Statement seems to read this into the regulations, for it speaks not of strict vicarious liability but only of a "positive *duty* on the major brand refiner to prevent any violation of the unleaded gasoline standard at his retail outlets." [72] At oral argument counsel for the Agency conceded that imposition

---

71. Statement, 38 Fed.Reg. at 1255.

72. *Id.* (Emphasis added.)

of strict vicarious liability would be "unjust" in the circumstances isolated by petitioners. While suggesting that the Agency would "remit" penalties imposed in such circumstances, counsel was unable to explain why the regulations themselves should not be construed to preclude injustice in the first instance. In our view the record, the Statement, and the concessions of counsel support 40 C.F.R. § 80.23(a)(1) & (2) to the extent that these provisions create a rebuttable presumption of liability on, respectively, refiners and distributors. But there is insufficient support from these sources for excluding affirmative defenses to the liability imposed. In enforcement actions the provisions must be construed accordingly. Refiners and distributors must have the opportunity to demonstrate freedom from fault. A distributor which can show that its employees and agents did not cause the contamination at issue may not be held liable under 40 C.F.R. § 80.23(a)(2). A refiner which can show that its employees, agents, or lessees did not cause the contamination at issue, and that the contamination could not have been prevented by a reasonable program of contractual oversight, may not be held liable under 40 C.F.R. § 80.23(a)(1).[73]

### E. The Absence of an Environmental Impact Statement

 Petitioners argue that an environmental impact statement was required with respect to these Fuel Regulations because, under Section 102(2)(C) of the National Environmental Policy Act,[74] such statements must accompany the "major Federal actions" of "all agencies of the Federal Government." We have grave doubt that Congress intended to subject EPA to the requirements of that Act; no Court of Appeals has ever so held. *See, e. g.,* An-

aconda Co. v. Ruckelshaus, 10 Cir., 482 F.2d 1301, 1305–1306 (1973); Buckeye Power, Inc. v. EPA, 6 Cir., 481 F.2d 162, 174 (1973); Getty Oil Co. (Eastern Operations) v. Ruckelshaus, 3 Cir., 467 F.2d 349, 359 (1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973).[75]

Furthermore, this court has invariably exempted EPA actions taken under the Clean Air Act from NEPA's requirement for an impact statement. *See, e. g.,* Essex Chemical Corp. v. Ruckelshaus, 158 U.S.App.D.C. 360, 364, 486 F.2d 427, 431 (1973) (action under Section 111 of the Act); Portland Cement Assn. v. Ruckelshaus, *supra,* 158 U.S. App.D.C. at 317–319, 486 F.2d at 384–386 (action under Section 111 of the Act); International Harvester Co. v. Ruckelshaus, *supra,* 155 U.S.App.D.C. at 446 n. 130, 478 F.2d at 650 n. 130 (action under Section 202(b)(5)(D) of the Act). *See also* the NEPA exemption found for EPA actions under Section 110 of the Clean Air Act in Buckeye Power, Inc. v. EPA, *supra,* 481 F.2d at 173–174; Duquesne Light Co. v. EPA, 3 Cir., 481 F.2d 1, 9 (1973); Appalachian Power Co. v. EPA, 4 Cir., 477 F.2d 495, 508 (1973).

Our rationale has been that the Clean Air Act provides, procedurally and substantively, for the "functional equivalent" of compliance with NEPA. Portland Cement Assn. v. Ruckelshaus, *supra,* 158 U.S.App.D.C. at 317, 486 F.2d at 384. *See also* Environmental Defense Fund, Inc. v. EPA, 160 U.S.App.D.C. 123, 132–133, 489 F.2d 1247, 1256–1257 (1973).

> \* \* \* [W]e see little need in requiring a NEPA statement from an agency whose raison d'être is the protection of the environment and whose decision on suspension is necessarily infused with the environmental con-

---

73. Subsequent to oral argument the Agency has proposed revisions in 40 C.F.R. § 80.23 which have not yet been made final. 39 Fed.Reg. 13174–13179 (April 11, 1974). These proposals are not before us in this litigation.

74. 42 U.S.C. § 4332(2)(C).

75. For a detailed discussion of the issue, *see* Portland Cement Assn. v. Ruckelshaus, *supra* note 55, 158 U.S.App.D.C. at 312–320, 486 F.2d at 379–387.

siderations so pertinent to Congress in designing the statutory framework. To require a "statement," in addition to a decision setting forth the same considerations, would be a legalism carried to the extreme. International Harvester Co. v. Ruckelshaus, *supra*, 155 U.S.App.D.C. at 446 n. 130, 478 F.2d at 650 n. 130. This does not mean that the Clean Air Act literally requires EPA to go through all the motions involved in filing an impact statement; indeed, the fact that the Clean Air Act calls for extraordinarily expeditious decision-making is one reason for exempting this decision-making from NEPA's time-consuming routine. Portland Cement Assn. v. Ruckelshaus, *supra*, 158 U.S.App.D.C. at 313–314, 486 F.2d at 380–381. Rather, the "functional equivalence" test merely recognizes that the Clean Air Act itself provides for orderly consideration of diverse environmental factors and that the Act's rule-making procedures "strike a workable balance between some of the advantages and disadvantages of full application of NEPA." *Id.*, 158 U.S.App.D.C. at 319, 486 F.2d at 386.

■ In this regard we note that Section 211(c) of the Clean Air Act, here at issue, requires EPA to weigh "available scientific and economic data, including a cost benefit analysis," in deciding whether or not to regulate fuels, Section 211(c)(2)(B), and that the Administrator must also find that prohibition of a particular fuel or additive will not cause use of an alternative of equal or greater danger to the public welfare, Section 211(c)(2)(C). There is provision, as elsewhere in the Act, for comment by interested parties, for a public hearing, and for full judicial review. Thus we find no cause in these cases for departing from the general rule that EPA actions under the Clean Air Act are exempt from NEPA's requirement of an environmental impact statement.

## III. CONCLUSION

The Agency may enforce the Fuel Regulations as of their effective date subject to the clarifications and exceptions noted in this opinion.

So ordered.

## APPENDIX

### Title 40—PROTECTION OF ENVIRONMENT

### Chapter I—Environmental Protection Agency

*Subchapter C—Air Programs*

### PART 80—REGULATION OF FUELS AND FUEL ADDITIVES

On February 23, 1972, a notice of proposed rule making was published in the Federal Register (37 FR 3882), setting forth proposed regulations promulgating Federal standards for the use of lead and phosphorus additives in gasoline. Pursuant to the above notice, several public hearings were held. In addition, numerous written comments were received during an extended public comment period. After consideration of the hearings' testimony and other comments, and after further consideration of the available information on health effects of airborne lead and the adverse effect of leaded gasoline on emission control devices, the regulations have been divided into two separate pieces of regulatory action; proposed regulations based upon the health effects of airborne lead, which provide for the reduction of lead in all grades of leaded gasoline, and final regulations, which provide for the general availability of lead-free gasoline. The regulations on reduction of lead for health reasons are being reproposed because the Agency's basis for the reduction has been substantially revised. The proposed regulations are published in this issue of the FEDERAL REGISTER, accompanied by an explanation of the basis for the reproposal. The regulations providing for the availability of lead-free and phosphorus-free fuel, modified as determined to be appropriate by the Agency, are promulgated below. The basis for this promulgation is explained below.

When the proposed regulations were published, the Administrator had determined that emission products of lead and phosphorus additives would impair to a significant degree the performance of emission control systems which include catalytic converters that motor vehicle manufacturers are developing to meet the 1975–76 motor vehicle emission standards and that are likely to be in general use if lead and phosphorus additives are controlled or prohibited for use in certain motor vehicle gasolines. This determination was based upon consideration of the available scientific and economic data including a cost-benefit analysis comparing motor vehicle emission control devices or systems which are or will be in general use and require control or prohibition of lead additives in gasolines with emission control devices or systems which are or will be in general use and do not require such control or prohibition of those additives. After identifying the emission control systems or devices under consideration by automobile manufacturers for meeting the 1975–76 standards, the Administrator determined that one system, the catalytic converter, would be in general use in the 1975 model year. Accordingly, a comparison of systems or devices was not feasible. Since publication of the proposed rule making, additional information on this subject has been submitted to the Agency during public hearings on the suspension of 1975 model year light duty motor vehicle emission standards, and the lead regulations hearings and comment period. This information provides further support for the Administrator's determination.

Therefore, the proposed provision for the general availability by July 1, 1974, of essentially lead-free and phosphorus-free gasolines of an octane quality suitable for 1975 and subsequent model year light duty vehicles is included in the final regulations. Copies of the cost-benefit analysis referred to above, entitled Aerospace Report, PB–205–981, are available for $4.50 each from National Technical Information Service, Department of Commerce, 5285 Port Royal Road, Springfield, VA. 22151.

At the time of the proposed rule making, the Administrator concluded that the proposed control of the use of lead additives and phosphorus-containing additives in lead-free gasoline would not cause the use of any other fuel or fuel additive that will produce emissions which will endanger the public health or welfare to the same or greater degree. Since that time, additional information has been developed which further supports the Administrator's earlier conclusion. This additional information and the basis for the original finding are set forth in a paper entitled "Effects of Reduced Use of Lead in Gasoline on Vehicle Emissions and Photochemical Reactivity" (with addendum). Copies of this paper are available from the Publications Section, Environmental Protection Agency, 401 M Street SW., Room 238W, Washington, DC 20460.

In the preamble to the proposed regulations, the Administrator invited comments concerning the effect of various levels of sulfur concentrations in lead-free and phosphorus-free gasoline on catalytic emission control systems, the impact of a sulfur limitation on the petroleum industry, and the impact of a sulfur limitation on motor vehicle performance and the cost of gasoline to the consumer. In light of these comments, the Administrator has determined that the currently available information is not adequate to clearly determine the impact of gasoline sulfur levels on emission control devices. Accordingly, additional information on both the effects of sulfur on catalyst deterioration and the impact of a sulfur regulation on the oil industry is required before regulatory action can be proposed.

The regulations as proposed provided that the lead content of unleaded gasoline not exceed 0.05 gram of lead per gallon. This maximum trace lead level is based upon the determination that it would provide adequate protection for catalyst emission control devices and that delivery of unleaded gasoline meet-

ing this specification is within the capability of the petroleum industry.

Most of the auto manufacturers initially asserted that the standard should be set at a maximum of 0.03 gram per gallon or less to prevent impairment of the effectiveness of the catalytic emission control devices. More recently, several manufacturers have stated that the proposed trace lead standard of 0.05 gram per gallon would be acceptable if such a standard assured that the average lead content of unleaded gasoline were 0.03 gram per gallon.

Spokesmen for the petroleum industry urged that the trace lead standard be set at 0.07 gram per gallon, the specification for unleaded gasoline established by the American Society for Testing and Materials. This specification was chosen on the basis of: (a) The capacity of the distribution system to deliver gasoline with low trace lead levels and (b) the reproducibility of the test methods. The experience of the petroleum industry as a whole in delivery of unleaded gasoline was conceded to be limited. The one company with substantial experience in the distribution of unleaded product is currently able to meet a 0.05 standard most of the time.

The regulations provide for the general availability of a lead-free and phosphorus-free gasoline with specified trace lead levels of 0.05 gram of lead per gallon. It is the Administrator's determination that without regulatory action requiring retail outlets to market at least one grade of such gasoline availability of that product to the general public in all areas of the country would be uncertain, and may not be sufficient to assure the protection of catalytic control devices. This regulation will determine the range of trace lead in gasoline which will be available to the consuming public for use in motor vehicles with control devices (e. g., from 0 gram lead to 0.05 gram lead). Based on the available data on marketing of unleaded gasolines, the Agency projects that a 0.05 gram of lead per gallon maximum will result in a 0.03 gram per gallon average lead content.

Since the Agency's motor vehicle certification regulations require that gasoline generally available at retail outlets be used in vehicle certification tests, 1975 model year vehicle certification testing will be required to be conducted using gasolines having a minimum lead content of 0.03 gram per gallon.

EPA has received numerous comments from the automobile industry requesting that the trace phosphorus level in the lead-free and phosphorus-free gasoline be lowered from the proposed level of 0.01 gram of phosphorus per gallon to 0.005 gram of phosphorus per gallon and below. After evaluating the catalyst deterioration data submitted in support of these requests, the Administrator has determined that the trace phosphorus level must be lowered to 0.005 gram of phosphorus per gallon in order to prevent catalyst deterioration which would preclude compliance with the emission standards for the useful life of 1975 and later model year vehicles. Though some members of the oil industry contend that a lower phosphorus level would remove some of the existing flexibility in the use of phosphorus detergent additives, the Agency has determined that the need for any such flexibility is outweighed by the need to prevent catalyst deterioration. Moreover, nonphosphorus additives are fast becoming the predominant detergents in unleaded gasoline and are already in large scale use.

Representatives of the petroleum industry have sought clarification of the term "owner or operator" of a retail outlet used in paragraphs (c), (d), and (g) of § 80.22 of the regulations as proposed. These paragraphs have been modified to adopt the terms of the definition of "owner or operator" contained in section 111(a)(5) of title I of the Clean Air Act which defines an "owner or operator" as any person who "owns, leases, operates, controls, or supervises" a regulated facility.

The final regulations do not include the proposed prohibition of the dyeing of unleaded gasolines or the proposed requirement that leaded gasolines be con-

spicuously colored. Based on comments received on the control of transport of unleaded gasoline, the Agency has determined that a color-coding system is not necessary to the implementation of this regulation.

The Agency agrees with comments received that engine octane demand decreases with increase in altitude, and has added to the requirement that retail outlets market unleaded gasoline of at least 91 octane a provision allowing reduction in octane number in high altitude areas.

The proposed regulations set forth labeling requirements for retail outlets and motor vehicles and dimensions specifications for pump nozzles and automobile fuel filler inlets to prevent accidental use of leaded gasoline in vehicles equipped with emission control devices requiring the use of unleaded fuel. The regulations include slight changes in the required fuel filter inlet and pump nozzle dimensions proposed, in accordance with the recommendations of the Society of Automotive Engineers.

The country's independent gasoline marketers have expressed concern that the major refiners, who currently provide their supply of leaded gasoline, will not produce enough unleaded gasoline during the transition period following the regulation's effective date to supply both the majors' branded outlets and the independent outlets. Based on the results of the Agency's evaluation of the independent marketers' supply problems, the Administrator has determined that it would be premature to conclude that gasoline refiners will be unable or unwilling to provide adequate supplies of unleaded gasoline to retail outlets required by these regulations to offer it. If the shortage of unleaded gasoline feared by the independent marketers materializes, this Agency will consider whether additional measures are necessary to assure the general availability of unleaded gasoline.

Comments were received which objected to the imposition of liability upon major brand refiners for sales at their retail outlets of unleaded gasoline containing lead in violation of the standard. The regulation retains this provision, with slight wording changes, based upon the Agency's determination that the contamination of unleaded gasoline associated with transportation of the product can best be prevented by the major refiners who have control or the ability to control their distribution networks. However, in order to clearly indicate that there is a positive duty on the major brand refiner to prevent any violation of the unleaded gasoline standard at his retail outlets, the Agency is proposing in this issue of the Federal Register a regulation specifically imposing this duty.

The regulations promulgated below shall be effective on February 9, 1973.

Dated: January 4, 1973.

WILLIAM D. RUCKELSHAUS,
*Administrator,*
*Environmental Protection Agency.*

A new Part 80 is added to Chapter I, Title 40 of the Code of Federal Regulations, as follows:

*Subpart A—General Provisions*

Sec.
80.1 Scope.
80.2 Definitions.
80.3 Test methods.
80.4 Right of entry; tests and inspections.
80.5 Penalties.

*Subpart B—Controls and Prohibitions*
80.20 [Reserved]
80.21 Controls applicable to gasoline distributors.
80.22 Controls applicable to gasoline retailers.
80.23 Liability for violations.
80.24 Controls applicable to motor vehicle manufacturers.

AUTHORITY: Secs. 211 and 301(a) of the Clean Air Act, as amended (42 U.S.C. § 1857f-6c).

*Subpart A—General Provisions*

§ 80.1 *Scope.*

This part prescribes regulations for the control and/or prohibitions of fuels and additives for use in motor vehicles and motor vehicle engines. These regulations are based upon a determination by the Administrator that the emission product of a fuel or additive will impair to a significant degree the performance of a motor vehicle emission control device in general use or which the Administrator finds has been developed to a point where in a reasonable time it would be in general use were such regulations promulgated; and certain other findings specified by the Act.

§ 80.2 *Definitions.*

As used in this part:

(a) "Act" means the Clean Air Act, as amended (42 U.S.C. 1857 et seq.).

(b) "Administrator" means the Administrator of the Environmental Protection Agency.

(c) "Gasoline" means any fuel sold in any State [1] for use in motor vehicles and motor vehicle engines, and commonly or commercially known or sold as gasoline.

(d) "Research octane number" means a measurement of a gasoline's knock characteristics which is determined by American Society for Testing and Materials analytical method designated D-2699.

(e) "Lead additive" means any substance containing lead or lead compounds.

(f) "Leaded gasoline" means gasoline which is produced with the use of any lead additive or which contains more than 0.05 gram of lead per gallon or more than 0.005 gram of phosphorus per gallon.

(g) "Unleaded gasoline" means gasoline containing not more than 0.05 gram of lead per gallon and not more than 0.005 gram of phosphorus per gallon.

(h) "Refinery" means plant at which gasoline is produced.

(i) "Refiner" means any person who owns, leases, operates, controls, or supervises a refinery.

(j) "Retail outlet" means any establishment at which gasoline is sold or offered for sale to the public.

(k) "Retailer" means any person who owns, leases, operates, controls, or supervises a retail outlet.

(*l*) "Distributor" means any person who transports or stores or causes the transportation or storage of gasoline at any point between any gasoline refinery and any retail outlet.

§ 80.3 *Test methods.*

The lead and phosphorus content of gasoline shall be determined in accordance with test methods to be prescribed by the Administrator.

§ 80.4 *Right of entry; tests and inspections.*

The Administrator or his authorized representative upon presentation of appropriate credentials shall have a right to enter upon or through any retail outlet or the premises or property of any distributor and shall have the right to make inspections, take samples, and conduct tests to determine compliance with this part and the Act.

§ 80.5 *Penalties.*

Any person who violates these regulations shall forfeit and pay to the United States a civil penalty of $10,000 for each and every day of the continuance of such violation, which shall accrue to the United States and be recovered in a civil suit in the name of the United States, brought in the district where such person has his principal office or any district in which he does business. The Administrator may, upon application by the person against whom any such penalty has been assessed, remit or mitigate any such forfeiture. The Administrator

---

1. "State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, and American Samoa.

shall have authority to determine the facts upon all such applications.

*Subpart B—Controls and Prohibitions*

§ 80.20 [*Reserved*]

§ 80.21 *Controls applicable to gasoline distributors.*

After July 1, 1974, no distributor shall sell to any distributor or retailer any gasoline which he represents is unleaded gasoline unless such gasoline does, in fact, meet the defined requirements for unleaded gasoline in § 80.-2(g).

§ 80.22 *Controls applicable to gasoline retailers.*

(a) After July 1, 1974, no retailer or his employee or agent shall introduce, or cause or allow the introduction of leaded gasoline into any motor vehicle which is labeled "unleaded gasoline only," or which is equipped with a gasoline tank filler inlet which is designed for the introduction of unleaded gasoline.

(b) After July 1, 1974, every person who owns, leases, operates, controls, or supervises a retail outlet at which 200,000 or more gallons of gasoline was sold during any calendar year beginning with the year 1971 shall offer for sale at least one grade of unleaded gasoline of not less than 91 Research Octane Number at such retail outlet: *Provided, however,* That the octane number of unleaded gasoline offered for sale in areas where altitude is greater than 2,000 feet may be reduced one (1) octane number for each succeeding 1,000 feet but not more than three (3) octane numbers in total.

(c) After July 1, 1974, every person who owns, leases, operates, controls, or supervises six or more retail outlets shall offer for sale at least one grade of unleaded gasoline of not less than 91 Research Octane Number at no fewer than 60 percent of such outlets; *Provided, however,* That the octane number of unleaded gasoline offered for sale in areas where altitude is greater than 2,000 feet may be reduced one (1) octane number for each succeeding 1,000 feet but not more than three (3) octane numbers in total.

(d) After July 1, 1974, every retailer shall prominently and conspicuously display in the immediate area of each gasoline pump stand the following notice:

Federal law prohibits the introduction of any gasoline containing lead or phosphorus into any motor vehicle labeled "UNLEADED GASOLINE ONLY."

Such notice shall be no smaller than 36-point bold type and shall be located so as to be readily visible to the retailer's employees and customers.

(e) After July 1, 1974, every retailer shall affix to each gasoline pump stand a permanent legible label as follows:

(1) For gasoline pump stands containing pumps for introduction of unleaded gasoline into motor vehicles, the label shall state:

Unleaded gasoline.

(2) For gasoline pump stands containing pumps for introduction of leaded gasoline into motor vehicles, the label shall state:

Contains lead antiknock compounds. Any label required under this paragraph shall be located so as to be readily visible to the retailer's employees and customers.

(f) After July 1, 1974, every retailer shall equip all gasoline pumps as follows:

(1) Each pump from which leaded gasoline is sold shall be equipped with a nozzle spout having a terminal end with an outside diameter of not less than 0.-930 inch (2.362 centimeters).

(2) Each pump from which unleaded gasoline is sold shall be equipped with a nozzle spout which meets the following specifications:

(i) The outside diameter of the terminal end shall not be greater than 0.840 inch (2.134 centimeters);

(ii) The terminal end shall have a straight section of at least 2.5 inches (6.34 centimeters) in length;

(iii) The retaining spring shall terminate 3.0 inches (7.6 centimeters) from the terminal end.

(g) If more than one grade of gasoline is dispensed from a gasoline pump or pump stand, the Administrator may grant an exception to paragraph (e) or (f) of this section where it has been demonstrated to his satisfaction that an alternate system of labeling or equipment will comply with the objectives of paragraph (e) or (f) of this section.

### § 80.23 *Liability for violations.*

Liability for violations of paragraph (a) of § 80.22 shall be determined as follows:

(a) (1) Where the corporate, trade, or brand name of a gasoline refiner or any of its marketing subsidiaries appears on the pump stand or is displayed at the retail outlet from which the gasoline was sold, the retailer and such gasoline refiner shall be deemed in violation. The refiner shall be deemed in violation irrespective or [sic] whether any refiner, distributor, or retailer, or the employees or agent of any refiner, distributor, or retailer may have caused or permitted the violation.

(2) Where the corporate, trade, or brand name of a gasoline refiner or any of its marketing subsidiaries does not appear on the pump or pump stand or is not displayed at the retail outlet from which the gasoline was sold, the retailer and any distributor who sold the retailer gasoline contained in the retail outlet storage tank which supplied that pump at the time of the violation shall be deemed in violation.

(b) (1) In any case in which a retailer and any gasoline refiner or distributor would be in violation under paragraph (a)(1) or (2) of § 80.22 the retailer shall not be liable if the retailer can demonstrate that the violation was not caused by him or his employee or agent.

(2) In any case under paragraph (a) (2) of § 80.22 in which two or more distributors have sold the retailer gasoline contained in the retail outlet storage tank which supplied the pump from which the gasoline was sold, any of such distributors who can demonstrate that the violation was not caused by him or his employee or agent shall not be liable.

(c) In any case in which a retailer or his employee or agent introduced leaded gasoline from a pump from which leaded gasoline is sold into a motor vehicle which is equipped with a gasoline tank filler inlet designed for the introduction of unleaded gasoline, only the retailer shall be deemed in violation.

### § 80.24 *Controls applicable to motor vehicle manufacturers.*

The manufacturer of any motor vehicle equipped with an emission control device which the Administrator has determined will be significantly impaired by the use of leaded gasoline shall:

(a) Affix two permanent, legible labels reading "Unleaded Gasoline Only" to such vehicle at the time of its manufacture, as follows:

(1) One label shall be located on the instrument panel so as to be readily visible to the operator of the vehicle: *Provided, however,* That the required statement may be incorporated into the design of the instrument panel rather than provided on a separate label; and

(2) One label shall be located immediately adjacent to the gasoline filler tank inlet, outside of any filler inlet compartment, and shall be located so as to be readily visible to any person introducing gasoline to such filler inlet. Such labels shall be in the English language in block letters which shall be of a color that contrasts with their background.

(b) Manufacture such vehicle with a gasoline tank filler inlet having a restriction with an inside diameter not greater than 0.910 inch (2.311 centimeters), which prevents the insertion of a nozzle with a spout larger than pre-

scribed in § 80.22(f)(2)(i). Such filler inlet shall be designed so as to activate immediately any automatic shutoff device on any nozzle subject to § 80.-22(f)(1) when the introduction of gasoline into such filler inlet from such a nozzle is attempted.

[FR Doc. 73–392 Filed 1–9–73; 8:45am]